UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAROL V. FRASER,

                              Plaintiff,                        DECISION AND ORDER

-vs-

                                                        05-CV-6047 CJS

JO ANNE B. BARNHART, Commissioner of
Social Security,

                              Defendant.

_____

**APPEARANCES**

For plaintiff:                                     Paul M. Ryther, Esq.
                                                    97 Main Street
                                                    P. O. Box 278
                                                    East Bloomfield, NY 14443
                                                    Tel: (585) 657-6040

For defendant:                                  Brian M. McCarthy, A.U.S.A.
                                                    U.S. Attorney's Office
                                                    100 State Street
                                                    Room 620
                                                    Rochester, NY 14614
                                                    Tel: (585) 263-6760, ext. 2233

**INTRODUCTION**

    **Siragusa, J.** This case is before the Court on the Commissioner's motion to remand (# 7) and plaintiff's motion (# 9), pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, directing an award of benefits or, in the alternative, remanding the matter to the

Commissioner for further consideration in accordance with the fourth sentence of 42 U.S.C. § 405(g). For the reasons stated below, the case is remanded for a new hearing.

## PROCEDURAL HISTORY

On December 5, 2002, plaintiff applied to the Social Security Administration for disability benefits due to neck and back pain, stating that medical complications had kept her from working since October 1, 1997. (R. 70.) On March 28, 2003, the Commissioner issued a decision denying plaintiff's application. (R. 64-67.) Subsequently, on April 28, 2003, plaintiff requested a hearing (R. 68), and a hearing was then held on April 27, 2004 before Administrative Law Judge ("ALJ") Michael J. Cummings. At the hearing, plaintiff was represented by paralegal Judith Cotton. (R. 15, 22, 38.) In a decision issued May 18, 2004, the ALJ found plaintiff was not disabled. (R. 16-22.) On July 14, 2004, plaintiff requested review by the Appeals Council, and, on December 16, 2004, the Appeals Council issued the final determination of the Commissioner affirming the denial of benefits. On February 4, 2005, plaintiff commenced the action before this Court.

## BACKGROUND

*Vocational and Social Background*

Plaintiff, who was born on December 23, 1944 (R. 70), graduated from high school and completed three years of college (R. 91, 272). Plaintiff has a brief work history. (R. 70.) From 1992 through 1997, she apparently worked as a household nutrition and cooking teacher in a community outreach program. (R. 43, 86.) This work required her to lift and carry groceries, kitchen equipment and instructional materials weighing as much as 20-25

pounds. It also required that she be on her feet walking, standing, and climbing for six hours a day and involved significant driving from site to site. (R. 43, 86.) Due to the brevity of her job history, her "specially insured status" for disability benefits purposes lapsed on December 31, 1997. (R. 72, 62.)

***Medical and Other Evidence***

On January 17, 1997, while driving, plaintiff was rear-ended by another automobile. X-rays taken that day showed "straightening to the cervical spine, consistent with muscular spasm. Slight disc space narrowing at C 3-4, C4-5 and C5-6. Slight foraminal encroachments bilaterally at C3-4, C4-5 and C6-7," but "no suggestion of fracture or other acute bony abnormality" and "mild degenerative changes with slight upper thoracic scoliosis, curve to the left." (R. 225.)

Following the motor vehicle collision, plaintiff's treating physician, Robert Kerper, M.D., examined her on January 17, 1997. (R. 229.) Unfortunately, his handwritten notes, gathered by the Commissioner and included in the record, are largely undecipherable by the Court except for a word or phrase here or there. However, it does appear, from the dates on the entries, that plaintiff saw Dr. Kerper regularly following the motor vehicle collision. In a typewritten letter dated August 20, 1998, Dr. Kerper wrote that he had seen plaintiff six times since November 6, 1997, and that her symptoms mainly were subjective with "a large psychosocial component." He also indicated that she had improved and that he expected a full recovery, but wrote that she was still was "fully disabled." (R. 215.)

In another typewritten letter dated February 18, 2000, Dr. Kerper reported that he was "sure that her chronic pain is mostly somatization secondary to the enormous emotional baggage that she carries. Her pain is under fair control with the Opioids that I

give her and carefully monitor. This of course has not enabled her to function in a work situation.…" (R. 203.) In a further typewritten report dated March 7, 2002, he stated that plaintiff "continues to have chronic pain.… Depression and family issues are factors markedly affecting her condition.…" He also stated, "I remain fairly pessimistic that she will ever be able to work on a regular basis." (R. 202.) In yet another typewritten correspondence, Dr. Kerper noted that plaintiff's pain had been triggered by the motor vehicle collision and "has been constant since." (R. 200.) He also wrote, "[u]nfortunately, it is impossible to say what percentage of her pain is secondary to the accident versus the underlying psychopathology." (R. 200.)

Timothy Clader, M.D., apparently an orthopedic specialist, examined plaintiff on February 6, 1997. He noted that she had

> an unremarkable general orthopaedic exam except for the cervical spine. She does have limited motion in all planes of a moderate degree and it is equal. There is some paracervical spasm present. There are no definitive trigger points present, however. There are no stretch or long tract signs. Deep tendon reflexes are all present and 2+. Motor and sensory are normal.… Shoulder exam shows fairly good motion without pain at the extremes. There is no drop sign, no impingement sign and an otherwise unremarkable exam.

(R. 109.) Dr. Clader's diagnosis was "[s]tatus post hyperextension injury, cervical spine (whiplash)." (*Id.*) He prescribed medications and physical therapy. (*Id.*)

A magnetic resonance image ("MRI") taken on March 26, 1997, revealed the following: "small central disc herniation with associated osteophytes seen at the C6-7 level" without "significant spinal canal or neural foraminal narrowing"; a "mild diffuse posterior osteophytic ridge seen at the C4-5 level"; "minimal diffuse posterior osteophytic ridge seen at the C3-4 level"; and an increased signal "consistent with an anular [sic] tear" at the C6-7

level. However, the MRI did not provide any evidence of cord deformity at any of these levels. (R. 107.) On April 2, 1997, after reviewing this MRI, Dr. Clader reported "that her symptoms are primarily degenerative in nature and there is no question that she is predisposed to a variety of cervical problems with this predisposition...." (R. 108.)

Plaintiff treated with chiropractor Dr. Susan Schliff, according to the record, from January 9, 1997 through April 2, 1999. In a report dated June 30, 1997, Dr. Schliff concluded that,

> patient is presently100% disabled from regular work activities as lifting and carrying on the job aggravates her condition. Authorization for home TENS unit is requested for patient use at home to reduce intensity and frequency of pain. Patient has also submitted request for home assistance in cleaning and shopping. It is my clinical impression that Ms. Fraser's prognosis is enhanced by these measures as ligamentous injury with probable disc involvement is longer to heal and aggravated by overuse and repetitive, prolonged weight bearing posture. This condition is complicated by degenerative joint disease frequently noted in patients over fifty years old.

(R. 172.) Dr. Schliff further indicated, "recommend reevaluation for return to work date August 18, 1997" and, she added, "prognosis is fair for treatment and management as described. Patient compliance to treatment regime and physical capabilities guidelines required." (R. 173.)

In an August 26, 1997 letter to insurance carrier New York Central Mutual, Dr. Schliff wrote, "patient remains disabled from return to work date of August 18, 1997 to projected date of October 1, 1997." (R. 161.) Then, in another letter dated October 6, 1997 to New York Central Mutual, Dr. Schliff indicated, "recent return to work date October 1, 1997 postponed until November 1, 1997 or as soon as patient reaches at least 85% of pre-injury state." (R. 155.) In further correspondence to New York Central Mutual dated November 20, 1997, Dr. Schliff wrote, "reevaluate for return to work date January 1, 1998."

(R. 152.) Then, in a letter to New York Central Mutual dated March 2, 1998, Dr. Schliff reported, "patient continues to be partially disabled in the cervical thoracic area." However, in her final report of April 2, 1999, which was included in the record, under the heading of disability status Dr. Schliff checked "none." (R. 128.)

Lester Gootnick, M.D., examined plaintiff on June 17, 1997, at the request of Medical Management Group, Inc.[1] Dr. Gootnick concluded that

> there were no objective findings such that would indicate any continuing or residual permanent disability causally related to the motor vehicle accident of January 17, 1997. Much of this patient's back motion restriction was, in my opinion, due to the degenerative changes noted on the xray and the patient's chronic obesity. Neurological examination is negative. The MRI findings are essentially that of degenerative spondylitis with no evidence of acute nerve root compression or radiculopathy.
>
> It is my opinion that at some time previous to my examination of June 11, 1997 this patient made a complete recovery from the injuries related to the motor vehicle accident of January 17, 1997 and retains no permanent disability causally related to those injuries. It is also my opinion that there has been no permanent aggravation of the pre-existing degenerative changes noted on [the] MRI which could be considered causally related to the motor vehicle accident of record.
>
> It [is] also my opinion the patient is able to continue with all of her previous work and household activities without household help and without restriction or impairment. It is also my opinion that the patient has reached maximum medical improvement and does not require any further diagnostic testing or medical, surgical, physical therapy or chiropractic treatment with regard to the motor vehicle accident of January 17, 1997.

(R. 103-04.)

On July 30, 1997, Paul Maurer, M.D., a neurosurgeon examined plaintiff at the request of Dr. Kerper. In a report dated August 3, 1997, Dr. Maurer reported "MRI which

---

[1] Plaintiff contends the examination was made on behalf of the motor vehicle insurance carrier; however, the record at 101 states that Dr. Gootnick's report was made pursuant to the request of Medical Management Group, Inc.

accompanies the patient is of extremely high quality and demonstrates a normal craniovertebral junction, inferior brain stem and spinal cord. There is a moderate of degenerative change fairly consistent with age." (R. 110.)

On September 24, 1997, Dr. Edward P. Doyle of Penfield Chiropractic, examined plaintiff on behalf of New York Central Mutual. (R. 114.) Dr. Doyle concluded that from a chiropractic standpoint, plaintiff was "able to return to work in a sedentary type position with restrictions on lifting over 15 pounds, [and] a limited amount of driving." (R. 116.)

On September 30, 1997, Louis Medved, M.D., examined plaintiff for New York Central Mutual. Dr. Medved diagnosed "[c]ervical and thoracic ligamentous strain with myofascial pain syndrome. There is radiographic evidence for pre-existing degenerative disease of the cervical and thoracic spine, which may be a contributory factor in the perpetuation of the claimant's symptoms. Prognosis is guarded." (R. 121.) He concluded, "the claimant's diagnoses are casually related to the motor vehicle accident of 1/17/97." (R. 121.)

On November 13, 1999, plaintiff began treating with Ann Griepp, M.D., for psychiatric care and continued treating at least through 2004. (R. 242.) On February 10, 2003, Dr. Griepp reported her diagnosis as "Axis I - Major Depression, recurrent, moderate and Chronic Pain Disorder; Axis II - Borderline Personality Disorder; Axis III - Obesity, Chronic Back and Neck Pain that is post motor vehicle accident; Axis IV - Stressors are social and financial.…" (R. 242.)

On February 24, 2003, James Devlin, M.D. completed a "Physical Residual Capacity Assessment." Based on his evaluation, Dr. Devlin concluded that plaintiff was able to lift 50 pounds occasionally, lift 25 pounds frequently, and that she could stand, walk, or sit

about six hours in an eight-hour day. He also concluded that there were no neurological deficits that could be attributed to the findings of the MRI. (R. 231-36.) In the report, he concluded,

> She was involved in an MVA on January 17, 1997 and suffered a cervical strain for which she received conservative treatment. She was employed as a teacher and continued to work until the end of the school year in June. An MRI of the cervical spine was done on March 26, 1997. The results showed that she had a small disc herniation at the C5-6 level. A[n] exam completed 6/17/97, diagnosis of ligament strain, cervical spine was given. There was no [sic] objective findings that would indicate any continuing or residual permanent disability. Her neurological was negitive [sic]. She has made a complete recovery from her accident injuries. She continued conservative treatment through the time period of 12/31/97.

(R. 232.) He also concluded that "her back condition did not reached [sic] the level of severity to be considered a disability." (R. 234.)

Regarding plaintiff's mental condition, Dr. Kerper, in a letter dated March 29, 2004, reported to Judith Cotton, the paralegal who represented plaintiff before the ALJ, that although he had not seen plaintiff since September of 2003, he concluded that,

> [o]verall, her underlying psychiatric problems, most likely originating from her abused childhood, have resulted in her morbid obesity and chronic pain syndrome.
>
> These physically disabling manifestations, compounded by the direct effects of her depression and personality disorder, cause her to be totally disabled with a poor prognosis.

(R. 247.) At that time, Dr. Kerper completed a residual functional capacity evaluation (mental impairment) in which he rated as moderately severe plaintiff's degree of restriction of daily activities, her degree of constriction of interests, her ability to meet production, quality and attendance standards, and her depression. He concluded that her prognosis was guarded. (R. 248-53.)

On April 20, 2004, Dr. Griepp completed a residual functional capacity evaluation (mental impairments) (R. 268-70) and opined that the deterioration in plaintiff's personal habits, and her limitations in responding appropriately to supervision and customary work pressures in a routine work setting, and in meeting production, quality and attendance standards, all were moderately severe. Dr. Griepp also stated that plaintiff had a "severe" restriction of daily activities, and that she had a moderate degree of depression, constriction of interests, and limitations in doing simple tasks and in doing complex tasks. In addition, Dr. Griepp considered plaintiff to have moderately severe limitations in performing repetitive tasks and in performing varied tasks noting that she, "gets stiff needs to reposition." (R. 269.)

Additionally, in connection with her mental impairments, plaintiff saw Phillip B. Haber, M.S., Psy.D., a psychologist and rehabilitation counselor, who evaluated her on July 2, 2004. Dr. Haber wrote in a letter dated July 26, 2004 to Ms. Cotton, that,

> I have had the opportunity of reviewing an abundance of medical reports from her treating physicians, her psychiatrist, various imaging institutions and chiropractors.…
>
> It is my understanding that [plaintiff] had a relatively small window of opportunity to recognize that she was permanently and totally disabled in order to apply for the Social Security Disability Income benefit. Furthermore, it is my understanding that the window was October 1, 1997 - December 31, 1997. Given the ongoing medical treatment and the hope that she would improve, there would have been no reason for her to think that she would be permanently and totally disabled during the SSDI application window. Fortunately, the medical evidence suggests that she was permanently and totally disabled as of the date of her termination from her employer.
>
> With regard to vocational rehabilitation, I can think of no programs of educational or vocational rehabilitation that would have restored her capacity to enter the workforce at any time since her injury, and thus, I don't think that there was anything that could have been done for [plaintiff] in terms of a return to work.

(R. 282.)

Then on August 16, 2004, Dr. Griepp wrote that she recently had been able to review records from Dr. Kerper which she had not seen before. She stated that it seemed clear to her from Dr. Kerper's notes that "[plaintiff's] depression was active from 1997." Dr. Griepp related plaintiff's exacerbation of mood instability and dissociative behaviors to her Borderline Personality Disorder, and opined that it was "quite believable" to her "that [plaintiff] would have been overwhelmed, sedated from medication, depressed, and completely missed or misunderstood filing dates for disability paperwork because of her combined medical and psychiatric issues." She wrote that, "Borderline Personality Disorder is an entity that is present with people from early in their lives, and certainly would have been an active diagnosis in 1997…." (R. 288.) She also described that, "[w]hen [plaintiff] first came to me in 1999 her dissociation was quite prevalent—she can 'zone out' in the middle of a session and miss significant material communicated with her." (R. 288-89.) Dr. Griepp concluded that

> it is highly probable that she had more problems with dissociation in the years preceding our treatment. This symptom is challenging in that [plaintiff] could have appeared as her 'regular self' and yet missed time frames, deadlines, or the entire content of conversations. Dissociation would have been worsened during a time of stress, pain or with sedating medications."

(R. 289.) Dr. Griepp also concluded that plaintiff "remains unable to demonstrate the necessary skills to return to work at the present time (*i.e.*, punctuality, consistent attendance, alertness, ability to perceive directions correctly, management of distress)" and had been so disabled since "after her accident in 1997." (R. 289.)

***The Commissioner's Decision***

The ALJ relied on the conclusions contained in Exhibit 12F (R. 231-36), the physical residual functional capacity assessment completed by Dr. Devlin, to find that, as of December 31, 1997, plaintiff retained the ability to "lift and carry 50 pounds occasionally and 25 pounds frequently, stand or walk for about 6 hours in an 8-hour workday and sit for about 6 hours," (R. 20) together with his assessment that her medical records showed "only mild degenerative disc disease, the absence of neurological deficits and conservative treatment (R. 20)." Upon these findings, the ALJ determined that plaintiff is not disabled because she could return to her prior work. (R. 21.)

## ANALYSIS

Plaintiff contends that the Commissioner's rules require a finding that she is disabled and entitled to benefits. (Pl.'s Mem. of Law at 17.) Plaintiff first[2] argues that psychiatric evidence as to limitations from her mental impairment relates back to her specially insured period and establishes she is disabled as of December 31, 1997. (*Id*.) She relies on a residual functional capacity evaluation (mental impairments) completed by Dr. Griepp on April 20, 2004. In that evaluation, Dr. Griepp concluded that as of April 20, 2004, plaintiff has severe limitation in the degree of restriction of her daily activities, and moderate limitation in her ability to perform repetitive and varied tasks. Dr. Griepp also found that plaintiff suffered moderately severe limitation in her ability to respond appropriately to

---

[2] Because the Commissioner has conceded in her papers that the ALJ's decision is not supported by substantial evidence and this case must be reversed and remanded, the Court addresses here only one of plaintiff's arguments — that any remand should be solely for calculation of benefits.

supervision and customary work pressures in a routine work setting, and in her ability to meet production, quality and attendance standards. (R. 268-69.) Essentially, plaintiff contends that this assessment by Dr. Griepp, coupled with her August 16, 2004 letter to Dr. Haber, in which she opines, retrospectively, that "it seems clear that Carol's depression was active from 1997," (R. 289), mandates a finding of disabled apart from any of plaintiff's physical impairments. In that regard, plaintiff maintains that her degree of limitation is greater than moderate, though not extreme, and, accordingly, equates with the Commissioner's designation of a "marked" impairment pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C). (Pl.'s Mem. of Law at 17.) Subparagraph C of § 12.00 of the appendix states, in part,

> C. Assessment of severity. We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. See §§404.1520a and 416.920a.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C) (2005). Consequently, plaintiff argues that the Commissioner erred in failing to find on this evidence that plaintiff's condition meets the description of a disabling impairment set forth in the Listings at 12.08, meeting both criteria "3" and "4" under 12.08 A., and the necessary two criteria under 12.08 B., *i.e.*, "2" and "3." The pertinent portions of those Listings state,

> 12.08 Personality Disorders: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic

features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following: …

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect; …

AND

B. Resulting in at least two of the following: …

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace.…

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.08(A) and (B) (2005).

On the other hand, the Commissioner responds that the medical evidence of record does not compel a finding of disabled and that a great deal of the evidence in the record suggests that plaintiff was, in fact, not disabled. (Def.'s Mem. of Law at 10.) In her memorandum of law, the Commissioner asserts that, "[p]laintiff alleged disability due to musculoskeletal impairments stemming from a car accident in January 1997, but continued working for the next six months until June 1997 (Tr. 85)." (Def.'s Mem. of Law at 10.) The Commissioner urges a remand, however, to correct what she concedes are legal errors in the ALJ's decision. (*Id.*)

However, a review of plaintiff's disability application reveals that plaintiff's asserted basis for her inability to work was "chronic pain in upper back, neck, behind right knee, right thigh," along with her assertion that "*I can't concentrate because of constant pain. I can't*

*lift—I walk with a cane—my whole life has changed.*" (R. 85 (emphasis added).) Nonetheless, the Commissioner maintains that the matter must be remanded for "further proceedings … in order to properly develop the record regarding the onset date of plaintiff's mental impairment in relation to the expiration of her insured status, and to evaluate all of the medical opinions of record." (Def.'s Mem. of Law at 2.) As the Commissioner suggests, because Dr. Griepp's retrospective opinion of August 16, 2004 was not before the ALJ when he issued his decision on May 18, 2004, he necessarily did not correctly apply the treating physician rule and further develop the record as to the severity of plaintiff's mental impairments prior to December 31, 1997. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development of the evidence."). The Court agrees with the Commissioner that this matter must be remanded.

It is, of course well settled that "[a] treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques." *See Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996). Further, the medical opinions of treating physicians are to be given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527 (d)(2) (2000). In this case, Dr. Griepp based her August 16, 2004 retrospective opinion upon Dr. Kerper's handwritten notes. Since the Court is unable to decipher these notes of Dr. Kerper, it is impossible for the Court to determine whether Dr. Kerper ordered any tests or performed any other "acceptable diagnostic techniques" to allow Dr. Griepp

to conclude, in her retrospective opinion, that plaintiff was disabled as of December 31, 1997. Moreover, while at oral argument plaintiff maintained that her physical impairments would also support a finding of "disabled," the Court disagrees, based on the conflicting medical evidence detailed above.

## CONCLUSION

Accordingly, the Court determines that the record does not compel a finding of "disabled," but rather, as the Commissioner maintains, needs to be developed further with proper application of the treating physician rule. Therefore, the Commissioner's and plaintiff's motions (## 7 & 9) are granted to the extent that the Commissioner's decision denying benefits is reversed and the case is remanded pursuant to the fourth sentence of § 405(g) for a new hearing. Plaintiff's alternative motion (# 9) for remand only to calculate benefits is denied.

It Is So Ordered.

DATED: February 27, 2006
Rochester, New York

ENTER.


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge